**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 17, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

TIMOTHY JOE JAMES,

    Defendant-Appellant.

No. 07-3296
(D.C. No. 2:06-20172-JWL-1)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, **HOLLOWAY**, and **HOLMES**, Circuit Judges.

## I. INTRODUCTION

Timothy Joe James pled guilty to the offense of being a felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1), and reserved his right to appeal the denial of a motion to suppress. Because he had three prior violent felony convictions, the district judge imposed the Armed Career Criminal Act's (ACCA) mandatory minimum 15 year sentence. Mr. James now appeals and argues that (1) his motion to suppress was improperly denied, and (2) the minimum sentence

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

is inapplicable, or if applicable, violates the Eighth Amendment. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(1), and affirm.

## II. BACKGROUND

### A. Mr. James's Motion to Suppress[1]

On October 30, 2006, Officer Trent McKinley of the Lawrence, Kansas, police department responded to a call from a local nursery. At the nursery, an employee informed him that two men had bought shrubbery and other items with a bad check. Both men were dressed as bail enforcement officers and had badges around their necks. The employee described one man as a white male between 42 to 50 years old, and described the other as a 35 year old white male. Their vehicle was described as an almost new white Jeep Cherokee with black trim that may have been rented.

Officer McKinley then determined after further investigation that Brian Schneider may have been one of the men responsible for the bad check. Officer McKinley also read a bulletin describing Mr. James as an associate of Mr. Schneider, and discovered that a parole violation warrant had been issued for Mr. Schneider.

Later that evening, Officer McKinley noticed a white male driving a white Jeep Cherokee with black trim. He determined the car was rented by using his in-car

---

[1]We summarize the pertinent evidence offered at the suppression hearing in the light most favorable to the government. *See United States v. Carter*, 511 F.3d 1264, 1267 (10th Cir. 2008) ("In reviewing a district court's denial of a motion to suppress, we view the evidence in the light most favorable to the government . . . .").

computer, and stopped the car. Officer McKinley thought the driver might be one of the two men involved in the nursery transaction. He did not recognize who the driver was until he saw the driver's identification.

When asked for his license, the driver gave Officer McKinley a state ID card that identified the driver as Timothy James. Officer McKinley thought it was significant that a state ID was produced rather than a driver's license. Officer McKinley explained that often if police are handed an ID card when a driver's license is requested, it indicates the person has had their license suspended or revoked. When the driver pulled out his state ID, Officer McKinley noticed a badge in the driver's wallet, and the driver said that he was a bail enforcement agent. Officer McKinley then requested the assistance of other officers. Officer McKinley asked if the car belonged to the driver, and the driver explained that it was leased to his friend, Mr. Schneider. Officer McKinley then checked Mr. James's state ID, found that his driving privileges were suspended, and arrested Mr. James. A firearm was then discovered in plain view between the driver's seat and the center console.

After taking Mr. James into custody, Officer McKinley interviewed him, and Mr. James told Officer McKinley that he worked in the bonding business for Jim Price. Officer McKinley asked where Mr. Schneider lived and Mr. James explained that Mr. Schneider lived in the Wichita area but came into town unannounced to do jobs for Mr. Price and always stayed in hotels.

After the interview, an officer familiar with Mr. Price, Officer Hamilton, went

to Mr. Price's apartment to obtain more information. Officer McKinley later arrived and the officers learned that Mr. James lived with "Brian" and had been planting bushes at his apartment that afternoon.

Both officers went to Mr. James's apartment and knocked on the door, and Officer Hamilton looked through a window and saw a white forearm pointing what looked like either a taser or a handgun at him. Shortly after that, Officer McKinley was able to get in contact with Mr. James on Mr. James's cell phone, and Mr. James acknowledged that Brian Schneider might be in the apartment. However, although Mr. James indicated that he was on his way to Kansas City, Officer McKinley was not certain that Mr. James was not also in the apartment.

Officer McKinley was eventually able to contact Mr. Schneider, and Mr. Schneider admitted he was the one with the taser. Officer McKinley agreed with Mr. Schneider that Mr. Schneider could see his girlfriend and smoke a cigarette before being taken to jail. Mr. Schneider then surrendered, was taken into custody, and then Mr. Schneider asked if they could wait inside the apartment. The officers granted the request. Officers then swept the apartment for other individuals and discovered a rifle and ammunition in plain view. Although Mr. Schneider told the officers that nobody else was in the apartment, Officer McKinley testified that before the sweep they had still not positively identified the person holding the taser. Officer McKinley explained that he was "absolutely not going inside that apartment to sit at a kitchen table with [Mr. Schneider] unless [he was] reasonably certain that there

-4-

[was] not another person inside with a weapon."

Mr. James filed a motion to suppress, contending that the vehicle stop and the sweep of his apartment violated the Fourth Amendment, and the motion was denied. He then pled guilty to being a felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1), but reserved the right to appeal the denial of his motion to suppress. He now appeals that denial and challenges the scope and duration of the vehicle stop and the sweep of his apartment.

## B. Sentencing

The presentence report indicated that Mr. James had been sentenced on three second-degree burglary convictions. The sentences were imposed on the same day in March 1983. Two of the underlying offenses had occurred on the same day, and another had occurred four days later, each without an intervening arrest. All occurred at structures with different addresses.

Because of Mr. James's convictions, the presentence report indicated that a minimum sentence of 15 years was applicable under the ACCA. At sentencing on October 1, 2007, the district judge rejected Mr. James's argument that the mandatory minimum sentence did not apply and, alternatively, that its application would violate the Eighth Amendment as cruel and unusual punishment. Mr. James was sentenced to 15 years in prison, and reasserts the same arguments on appeal.

## III. DISCUSSION

### A. The Motion to Suppress

"In reviewing a district court's denial of a motion to suppress, we view the evidence in the light most favorable to the government and accept the court's factual findings unless they are clearly erroneous." *Carter*, 511 F.3d at 1267. However, the court's conclusions as to whether a seizure was supported by reasonable suspicion are reviewed *de novo*. *United States v. Alarcon-Gonzalez*, 73 F.3d 289, 291 (10th Cir. 1996). Moreover, "[w]e review de novo the ultimate determination of reasonableness under the Fourth Amendment." *Carter*, 511 F.3d at 1267. Mr. James argues that the district judge erred in denying his motion to suppress. He asserts that the scope and duration of the vehicle stop and the sweep of his apartment violated the Fourth Amendment.

### 1. Whether the scope and duration of Mr. James's detention were improper

Although Mr. James challenged the initial stop in the district court, he now concedes that the initial stop was valid and instead challenges the scope and duration of the stop. In essence, Mr. James argues that once Officer McKinley realized during the stop that Mr. Schneider was not the driver of the Jeep, and that the only justification for the stop (i.e., finding Mr. Schneider because of his outstanding parole violation warrant) was therefore dispelled, he should have allowed Mr. James to leave the scene. Mr. James did not challenge the scope and duration of the stop in his motion to suppress, and we therefore review the district judge's ruling for

plain error. *See United States v. Ramirez*, 63 F.3d 937, 947 (10th Cir. 1995) (explaining that because the appellant failed to include an argument in his motion to suppress he had waived it, and the court would therefore review the admission of the evidence for plain error). We conclude that there was no error here.

We agree with the parties that the stopping of Mr. James while he was driving was an "investigative detention." *See United States v. Brown*, 496 F.3d 1070, 1074 (10th Cir. 2007) (recognizing that an investigative detention is a Fourth Amendment seizure of limited scope and duration). In evaluating the validity of an investigative detention, we consider the totality of the circumstances. *Id.* To determine whether the detention was constitutionally permitted, we ask whether the officer's actions were justified at their inception, and whether they were reasonably related in scope to the circumstances which justified the interference in the first place. *Id.*

At the moment an officer stops an individual, the officer must possess "reasonable articulable suspicion that the occupants had been, were, or were about to be engaged in criminal activity." *See United States v. Ortiz*, 63 F.3d 952, 954 (10th Cir. 1995) ("Examining, as we must, the totality of the circumstances, . . . we think it clear that at the moment the police stopped the truck, they possessed the requisite reasonable articulable suspicion that the occupants had been, were, or were about to be engaged in criminal activity."). Further, "reasonable suspicion must exist at all stages of the detention, although it need not be based on the same facts throughout." *United States v. Soto-Cervantes*, 138 F.3d 1319, 1322 (10th Cir. 1998).

An officer must be able to point to specific and articulable facts to support a finding of reasonable suspicion. *Id.*

Mr. James concedes that the initial stop of the Jeep Cherokee driven by him was valid. However, we conclude that the remainder of the detention was also valid. After the initial stop Officer McKinley continued to possess sufficient reasonable suspicion to detain Mr. James for questioning about the bad check transaction. At that moment, Officer McKinley knew the driver was in a car that matched the nursery employee's description of the car used by the writer of the bad check (i.e., a white Jeep Cherokee with black trim that was rented). Further, the driver was a white male, and Officer McKinley knew that an unknown white male other than Mr. Schneider had been involved in the bad check transaction. With this knowledge, it was reasonable for Officer McKinley to ask for identification to gather information about a possible participant in the bad check transaction.

Further, after Mr. James gave Officer McKinley a state ID rather than a driver's license, it was reasonable to suspect Mr. James had been driving unlawfully and to detain him until his license was checked. Officer McKinley testified that when a person hands the officer an ID card when asked for a driver's license, it often indicates the person has had their driving privileges suspended or revoked. Officer McKinley confirmed that Mr. James's driver's license was suspended and arrested him, and this arrest lead to the finding of the gun in the car.

Viewing the totality of the circumstances, we conclude that although the facts

supporting reasonable suspicion were not the same throughout Mr. James's detention, reasonable suspicion based on specific and articulable facts existed at all stages of Officer McKinley's detention of Mr. James, and Officer McKinley's actions were reasonably related to the circumstances that gave rise to suspicion. Therefore, it was not error to admit the evidence discovered during the vehicle stop.

**2. Whether the protective sweep of Mr. James's apartment was proper**

Mr. James also argues that the sweep of his apartment following Mr. Schneider's arrest violated the Fourth Amendment because the officers were motivated by a desire to seize evidence, and the officers could not have reasonably believed they faced an imminent threat to their safety. We cannot agree.

"'A "protective sweep" is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.'" *United States v. Freeman*, 479 F.3d 743, 750 (10th Cir. 2007) (quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990)). For a protective sweep to be upheld under the Fourth Amendment, an officer must have possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others. *Id.* The search must not be motivated by an intent to seize evidence. *Fishbein v. City of Glenwood Springs, Colorado*, 469 F.3d 957, 961 (10th Cir. 2006). Reasonable suspicion to support a protective sweep may arise when officers know an occupant has a weapon, has

threatened to use it in an unlawful manner, and may be present in the residence. *United States v. Torres-Castro*, 470 F.3d 992, 998 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 2285 (2007).

Immediately after the standoff concluded, Mr. Schneider asked if he and the police could wait inside the apartment for his girlfriend. The request was granted, and shortly there was a protective sweep of the apartment. Officer McKinley testified that before the sweep they had not yet positively identified the person who was holding the taser, and he was "absolutely not going inside that apartment to sit at a kitchen table with [Mr. Schneider] unless [he was] reasonably certain that there [was] not another person inside with a weapon." Although Mr. Schneider had admitted that he pointed the taser at Officer Hamilton, and had said he was the only person in the apartment, the police were not required to believe him. When Officer Hamilton had looked through the window he saw only a white forearm holding something that was possibly a gun, leaving open the possibility that there was another person in the apartment. Further, although Mr. James told Officer McKinley he was on his way to Kansas City, Officer McKinley was uncertain whether Mr. James was actually in the apartment. This uncertainty was reasonable because Mr. James had been dishonest with Officer McKinley during their interview about where Mr. Schneider was living.

There is no evidence that the officers were motivated by anything other than a reasonable belief that the apartment harbored a dangerous and as yet unidentified

individual.  *See Torres-Castro*, 470 F.3d at 998 (concluding that reasonable suspicion to support a protective sweep may arise when officers know an occupant has a weapon, has threatened to use it in an unlawful manner, and may be present in the residence).  The protective sweep was justified.

### B.  Sentencing Challenges–The Armed Career Criminal Act

Mr. James argues that the ACCA's mandatory minimum sentence should not have been applied to him, and even if it was proper to apply it, it violates the Eighth Amendment.  We review *de novo* the district judge's application and interpretation of the ACCA.  *United States v. Michel*, 446 F.3d 1122, 1133 (10th Cir. 2006).  We also review *de novo* the question whether a criminal sentence violates the Eighth Amendment.  *United States v. Angelos*, 433 F.3d 738, 750 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 723 (2006).

### 1.  Whether the ACCA mandatory minimum sentence applies to Mr. James

Mr. James argues that his burglary convictions were not committed on different occasions for purposes of the ACCA, and therefore the minimum 15 year sentence does not apply.  We, however, conclude that the minimum sentence applies.

The ACCA, 18 U.S.C. § 924(e), provides that a person who violates § 922(g) and has three violent felony convictions (e.g., a burglary conviction  punishable for more than one year) "committed on occasions different from one another" must be imprisoned for a minimum of 15 years.  18 U.S.C. § 924(e)(1), (2)(B)(ii).  The prior convictions must arise from "'separate criminal transactions.'"  *United States v.*

*Tisdale*, 921 F.2d 1095, 1098 (10th Cir. 1990) (quoting *United States v. Bolton*, 905 F.2d 319, 323 (10th Cir. 1990)). Further, § 924(e)(1) was intended to reach multiple criminal episodes distinct in time. *Id.* at 1098–99.

Mr. James acknowledges that our decisions interpreting § 924(e) do not support his argument that the mandatory minimum sentence does not apply here, but he nevertheless asks this court to revisit those decisions, particularly our decision in *United States v. Tisdale*.[2] However, "'[a]bsent an intervening Supreme Court or en banc decision justifying such action, we lack the power to overrule' our own precedent." *United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1333 (10th Cir. 2003) (quoting *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 985 (10th Cir. 1996)). There is no such intervening decision here, and we therefore address his argument applying pertinent circuit precedent.

Our decision in *United States v. Tisdale* controls our resolution of Mr. James's argument. In *Tisdale*, the appellant had three burglary convictions for conduct which occurred on the same date. 921 F.2d at 1098. The appellant had broken into a shopping mall and burglarized two private businesses and a post office located inside. *Id.* The trial court used the burglary convictions to enhance the appellant's sentence under § 924(e)(1). *Id.* We noted that it was clear that the appellant could not simultaneously burglarize three separate businesses. *Id.* at 1099. Further, we observed that after the appellant had successfully completed burglarizing one

_____

[2]Mr. James does not contest the underlying facts of his prior convictions.

business, he was free to leave, and the fact that he chose, instead, to burglarize another business was evidence of his intent to engage in a separate criminal episode. *Id.* We also noted that the burglaries did not occur at the same location–although the appellant entered only one mall, he had to break into three separate structures. *Id*. We therefore concluded that the crimes were committed at different locations, and the trial court had properly enhanced the appellant's sentence. *Id.*

Mr. James's burglaries are more separate than those in *Tisdale*. Here, only two of Mr. James's three burglaries occurred on the same day, and all three occurred at structures with different addresses. Further, similarly to the appellant in *Tisdale*, Mr. James could not have committed the burglaries simultaneously, and he was free to avoid committing the successive burglaries. His choice to instead burglarize another address evinces his intent to engage in a separate criminal episode. The district judge properly concluded that the burglaries were committed on separate occasions.

## 2. Whether the mandatory minimum sentence is cruel and unusual

Mr. James further argues that even if the mandatory minimum sentence applies, it violates the Eighth Amendment because it is grossly disproportionate to his crime. He explains that all of his previous convictions were more than 24 years old at the time of sentencing, and since those convictions he has been an employed, constructive member of society. However, we find no Eighth Amendment violation.

In reviewing Eighth Amendment proportionality challenges, we examine the

sentence at issue in relation to the crime for "gross disproportionality." *United States v. Gurule*, 461 F.3d 1238, 1247 (10th Cir. 2006). If we find no gross disproportionality, our analysis ends. *Id.* It is only in a rare case that a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality. *Id.* For example, we have held not grossly disproportional the imposition of a life sentence after a carjacking conviction when the appellant had two robbery convictions and one of the robbery convictions was over 30 years old. *Id.* at 1240, 1242, 1247–48. Further, we have acknowledged that, "[i]n general, a sentence within the limits imposed by statute is neither excessive nor cruel and unusual under the Eighth Amendment," and a legislature is justified in punishing a recidivist more severely than it punishes a first offender. *Id.* at 1247; *United States v. Delacruz-Soto*, 414 F.3d 1158, 1168 (10th Cir. 2005).

Here, we conclude that this is not a rare case in which the sentence imposed is grossly disproportionate to the crime. The 15 year sentence imposed on Mr. James following his three previous felony convictions is much less harsh than the life sentence we upheld in *Gurule*, which followed only two felony convictions, one of which was older than Mr. James's burglary convictions. *See Gurule*, 461 F.3d at 1240, 1242, 1247–48. In addition, his sentence is not only within the limits imposed by the ACCA, it is the *minimum* sentence available to him under § 924(e)(1). *See* § 924(e)(1) (requiring imprisonment for "not less than" 15 years). Importantly, Mr. James's sentence was not enhanced under the ACCA only because he was caught

with firearms; rather, his sentence was enhanced because he was caught with firearms after having committed three violent felonies. Congress is justified in punishing a recidivist, such as Mr. James, more severely than a first offender. *See Gurule*, 461 F.3d at 1247. His sentence does not violate the Eighth Amendment.

## IV. CONCLUSION

We conclude that the investigative detention of Mr. James and the later protective sweep of the apartment he shared with Mr. Schneider did not violate the Fourth Amendment. Further, the district judge properly applied the mandatory minimum sentence as required by the Armed Career Criminal Act, and in doing so the Eighth Amendment was not violated. Accordingly, we **AFFIRM** the district judge's denial of Mr. James's motion to suppress, and the conviction and the sentence imposed under the Armed Career Criminal Act.

IT IS SO ORDERED.

Entered for the Court,

William J. Holloway, Jr.
Circuit Judge